UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JULIE DOE, | : | |
| Plaintiff, | : | CIVIL ACTION - LAW |
| - against - | : | |
| | | No. |
| | : | |
| BRYAN MCQUILLAN; RYAN CZECH | | **JURY TRIAL DEMANDED** |
| DONALD MULLEN; JOSEPH | : | |
| MUSCARA; CHARLES PAYNE; | | |
| MADELEINE BREE  SEDORE; | : | |
| EARL A. SAURMAN; JOHN DOE 1, | | |
| ABINGTON MEMORIAL HOSPITAL, | : | |
| d/b/a ABINGTON HOSPITAL and | | |
| ABINGTON HOSPITAL JEFFERSON: | | |
| HEALTH; THOMAS JEFFERSON | | |
| UNIVERSITY; THOMAS | : | |
| JEFFERSON UNIVERSITY | | |
| HOSPITALS, INC.; JEFFERSON | : | |
| HEALTH CORPORATION; | | |
| JEFFERSON HEALTH – | : | |
| NORTHEAST FOUNDATION, | | |
| and ABINGTON EMERGENCY | : | |
| PHYSICIAN ASSOCIATES, P.C., | | |
| | : | |
| Defendants. | | |

**COMPLAINT**

Plaintiff Julie Doe,[1] by and through her attorneys, Dyller &

---

[1] Plaintiff proceeds under the pseudonym "Julie Doe" because this action involves highly sensitive mental health information, the public

Solomon, LLC, Barry H. Dyller, Esq., and Matthew L. Clemente, Esq., for her Complaint alleges the following:

## INTRODUCTION

1. This case involves: (1) an assault and egregious use of excessive by a hospital security guard, Defendant Bryan McQuillan, against a helpless patient, Plaintiff Julie Doe, (2) a conspiracy by hospital employees to cover up the assault, and (3) a police officer, Defendant Earl A. Saurman, who filed false charges against *the patient* despite video evidence demonstrating that the patient was the *victim* of the assault.

2. Plaintiff Julie Doe went to Defendant Abington Memorial Hospital d/b/a Abington Hospital and Abington Hospital Jefferson Health ("the hospital" or "Abington Hospital") for help, but instead was assaulted, drugged and involuntarily committed to a mental health hospital.

3. Julie Doe was subsequently falsely arrested and charged with assaulting the security guard, Defendant McQuillan, even though

---

disclosure of which would risk substantial stigma and harm. See *Doe v. Megless*, 654 F.3d 404 (3d Cir. 2011). Upon information and belief, Plaintiff's true identity is known to defendants.

Defendant McQuillan violently assaulted and choked *her* until he rendered unconscious.

4. Defendant McQuillan then began a conspiracy to cover up his misconduct by reporting Julie Doe to the Abington Township Police Department.

5. Defendant Saurman took Defendant McQuillan's report and filed charges against Julie Doe without doing any investigation.

6. For example, Defendant Saurman did not bother to seek or review the hospital's security footage.

7. Even after he was provided the exculpatory video footage, Defendant Saurman willfully failed to disclose this key evidence and induced Julie Doe to plead guilty to a crime that she did not commit.

8. Fortunately, a hospital whistleblower viewed and preserved the video of Julie Doe's assault.

9. Outraged after the security guard, Defendant McQuillan, bragged about "body slamming" Julie Doe, the whistleblower reported the guard's misconduct to hospital officials, who ignored the whistleblower's pleas to discipline the guard and prevent the guard from interacting with patients.

10. Although a later investigation by the Pennsylvania Department of Health ("DOH") found that the security guard "used excessive force," the hospital repeatedly chose to protect the security guard and to cover up its employee's assault of Julie Doe.

## JURISDICTION AND VENUE

11. This action arises out of violations of the United States Constitution brought pursuant to 42 U.S.C. § 1983, the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*, and the Pennsylvania common law.

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, and 42 U.S.C. § 794a(a)(2) incorporating 42 U.S.C. § 2000e-5.

13. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## THE PARTIES

14. Plaintiff Julie Doe was at all relevant times hereto a resident of Ambler, Pennsylvania.

15. Defendant Abington Memorial Hospital ("Defendant Abington Hospital"), d/b/a Abington Hospital and Abington Hospital Jefferson

4

Health, is a nonprofit organization located in Abington, Pennsylvania.

16. Defendant Thomas Jefferson University is a nonprofit organization located in Philadelphia, Pennsylvania.

17. Defendant Thomas Jefferson University Hospital, Inc. is a nonprofit organization located in Philadelphia, Pennsylvania.

18. Defendant Jefferson Health – Northeast Foundation is a nonprofit organization located in Philadelphia, Pennsylvania.

19. Defendants Thomas Jefferson University, Thomas Jefferson University Hospital, Inc., and Jefferson Health – Northeast Foundation are sometimes referred to herein as "Jefferson Defendants."

20. Jefferson Defendants and Defendant Abington Hospital are sometimes referred to herein as "Hospital Defendants."

21. Upon information and belief Jefferson Defendants own, operate and/or partner with Abington Hospital.

22. Defendant Abington Emergency Physician Associates, P.C. ("AEPA") is a corporation located in Abington, Pennsylvania that provides staff for the emergency department of Abington Hospital.

23. Defendant Bryan McQuillan ("McQuillan") was, during the relevant time period, a security guard at Abington Hospital.

5

24. Upon information and belief, McQuillan is a resident of the Commonwealth of Pennsylvania and was at all relevant times an employee and/or agent of Abington Hospital, AEPA and/or Jefferson Defendants.

25. Defendant Ryan Czech ("Czech") was, during the relevant time period, a security guard at Abington Hospital.

26. Upon information and belief, Czech is a resident of the Commonwealth of Pennsylvania and an employee and/or agent of Abington Hospital, AEPA and/or Jefferson Defendants.

27. Defendant Donald Mullen ("Mullen") was, during the relevant time period, a doctor at Abington Hospital.

28. Upon information and belief, Mullen is a resident of the Commonwealth of Pennsylvania and an employee and/or agent of Abington Hospital, AEPA and/or Jefferson Defendants.

29. Defendant Joseph Muscara ("Muscara") was, during the relevant time period, a doctor at Abington Hospital.

30. Upon information and belief, Muscara is a resident of the Commonwealth of Pennsylvania and an employee and/or agent of Abington Hospital, AEPA and/or Jefferson Defendants.

31. Defendant Madeleine Bree Sedore ("Sedore") was, during the relevant time period, a physician assistant at Abington Hospital.

32. Upon information and belief, Sedore is a resident of the Commonwealth of Pennsylvania and an employee and/or agent of Abington Hospital, AEPA and/or Jefferson Defendants.

33. Defendants Mullen, Muscara, and Sedore are sometimes referred to herein as "Medical Defendants."

34. Defendant Charles Payne ("Payne") was, during the relevant time period, a registered nurse and the director of security at Abington Hospital.

35. Upon information and belief, Payne is a resident of the Commonwealth of Pennsylvania and an employee and/or agent of Abington Hospital, AEPA and/or Jefferson Defendants.

36. Defendant Earl A. Saurman ("Saurman") was, during the relevant time period, a police officer with the Abington Township Police Department.

37. Upon information and belief, Saurman is a resident of the Commonwealth of Pennsylvania and an employee of Abington Township.

7

38. John Doe 1 is a police officer with supervisory authority with the Abington Township Police Department.

39. Upon information and belief, John Doe 1 is a resident of the Commonwealth of Pennsylvania and an employee of Abington Township.

## FACTUAL BACKGROUND

Julie Doe Seeks Treatment / Cooperates with Hospital Staff

40. On April 23, 2024, Plaintiff Julie Doe voluntarily went to the Abington Hospital Emergency Room ("ER") with her husband.

41. Julie Doe, who had previously been diagnosed with bipolar disorder[2] and complex post-traumatic stress disorder, sought treatment in relation to a trauma response.

42. Julie Doe arrived at ER at approximately 6PM.

43. Julie Doe allowed the nurse treating her to draw her blood for testing.

44. Julie Doe complied with hospital staff as they conducted an electrocardiogram.

---

[2] This prior diagnosis of bipolar disorder by the Hospital Defendants appears to have been inaccurate.

45. Julie Doe cooperated with a nurse who placed a peripheral IV.

46. At approximately 6:30 PM, Julie Doe allowed hospital staff to administer medications, one through her IV and one through an intramuscular injection in her shoulder.

47. At 8:14 PM, a nurse conducted a manic behavior assessment, which reflected that Julie Doe was medically stable.

48. According to her medical records, Julie Doe was awake, neurologically intact, and demonstrating manic-type speech.

49. The records contain no documentation of suicidal ideation, homicidal ideation, aggression, risk of flight, or behavior indicating imminent danger to herself or others.

50. At 8:27 PM, the same nurse noted that Julie Doe was "resting comfortably."

51. At 9:55PM, Defendant Sedore took over Julie Doe's care as her PA.

52. Defendant Mullen had been the attending doctor during the course of Julie Doe's care up to this point.

Julie Doe Attacked Heading to the Bathroom

53. Shortly after 11PM, Julie Doe walked into the hallway of the

9

ER to go to the bathroom.

54. Prior to leaving her room, Julie Doe used a blanket to cover herself.

55. Surveillance footage shows Julie Doe walking towards a restroom.

56. At this point, Julie Doe was in the ER voluntarily and was free to leave the hospital.

57. However, two security guards, Defendants McQuillan and Czech, began to follow her.



58. Despite no evidence that Julie Doe was violent or attempting to flee from the hospital, Defendant McQuillan stepped directly in front of her and pinned Julie Doe against a wall.



59. Defendant McQuillan initiated a struggle with Julie Doe, thrusting his forearm into her ribs and shoving her into a wall.



60. Defendant McQuillan then wrapped his arm around Julie Doe's chest, grabbed her by the shoulders and began grappling with her.



61. After Julie Doe attempted to break free from Defendant McQuillan's manhandling, Defendant McQuillan violently jerked her torso and yanked her body with such force that she spun.



62. Defendants McQuillan and Czech then wrestled Julie Doe to the ground and fell on her.

63. Within 20 seconds, Defendant McQuillan pinned her back against the floor and grabbed her by the chest and neck area.



64. Defendants McQuillan and Czech held her onto the floor until Julie Doe was rendered unconscious. Julie Doe was lifted onto a gurney.

65. Despite being unconscious and that no doctor or other medical provider had previously ordered restraints of any kind, Julie Doe was placed in physical restraints.

66. Despite being violently attacked and choked until she was rendered unconscious, none of the defendants, or their agents or employees, performed any imaging to determine whether Julie Doe was injured during the assault.

Conspiracy to Cover Up Assault Begins

67. Within minutes of Julie Doe's assault, Defendants McQuillan, Sedore and Mullen begin a campaign to cover up Defendant McQuillan's misconduct.

68. At 11:16 PM, Defendant Sedore placed a note in Julie Doe's

chart containing false information, which is contradicted by the surveillance footage.

    a. For instance, Defendant Sedore falsely charted that Julie Doe was "verbally and physically aggressive," despite that the security footage revealed that Defendant McQuillan was the aggressor.[3]

    b. Defendant Sedore falsely charted that Julie Doe "attempt[ed]," to elope [from] the emergency department," despite no evidence to support this claim.

    c. Defendant Sedore falsely indicated that a "security officer attempted to redirect her" when in actuality Defendant McQuillan initiated a struggle with Julie Doe and thrust her into a wall.

    d. Defendant Sedore falsely stated that Julie Doe "spit at [Defendant McQuillan] and attempted to punch and hit him," again contrary to the security footage.

69. Upon information and belief, Defendant Sedore charted false

---

[3] As noted below (see *infra* paragraph 122), Defendant McQuillan later admitted that Julie Doe does was *not* verbally or physically aggressive.

information in an attempt to justify and cover up Defendant

McQuillan's assault.

70. At 11:38PM, Mullen revised his note from 6:24 PM.

71. At 6:24 PM, Mullen's original note indicated that Julie Doe

was alert and stable but displayed flight of ideas and rambling speech.

72. Mullen's original note contained no documentation of suicidal

ideation, homicidal ideation, aggression, risk of flight, or behavior

indicating imminent danger to herself or others.

73. Mullen's 11:38 PM note falsely documented that Julie Doe

"attempted to leave the emergency department" and required use of

arm and leg restrains.[4]

74. Upon information and belief, Mullen revised his note in order

to attempt to justify and cover up Defendant McQuillan's assault.

Defendants Muscara and Sedore Excessively
Sedate and Maliciously Restrain Julie Doe

75. Following the assault, Defendants Sedore and Muscara

excessively sedated and unnecessarily restrained Julie Doe.

---

[4] Although it was false that Julie Doe was "attempting to leave the emergency department," Julie Doe had the right to leave the hospital. Mullen declined to note that Julie Doe was a free woman and thus permitted to leave the hospital if she so chose.

76. Upon information and belief, Defendants Sedore and Muscara excessively sedated and unnecessarily restrained Julie Doe for their convenience and to control her.

77. Use of restraints, physical or chemical, should be done sparingly.

78. Medical ethics dictate that use of restraints should be a last resort and only when necessary to ensure the immediate physical safety of the patient, staff, or others.

79. Restraints should not be used for convenience, punishment, or as a standing response.

80. They must be removed at the earliest possible time.

81. After she was assaulted and rendered unconscious, at 23:10, Julie Doe's flaccid body was hoisted onto a stretcher.

82. Even though she was unconscious, at 23:16, Defendant Muscara ordered that Julie Doe be physically restrained.

83. Despite Julie Doe having previously been given 5mg of Haldol at 18:31 and a 25mg dose of Benadryl at 18:33, Defendant Sedore, with Defendant Muscara as her attending doctor, ordered that Julie Doe receive an additional 5mg of Haldol, 50mg dose of Benadryl, and 2mg of

16

Ativan.

84. Although these orders were placed at 23:13-14, they were not administered until 23:48.

85. Even after the excessive sedation was administered, the physical restraints were not removed.

86. By 00:15 on April 24, 2024, Julie Doe was asleep. The physical restraints were not removed.

87. An hour later, at 01:15, Julie Doe was reportedly "Awake; Calm; [and] Cooperative," but "Complaining in pain from restraints." However, the physical restraints were not removed.

88. Neither Defendant Sedore nor Defendant Muscara physically examined Julie Doe to determine whether physical or chemical restraints continued to be required.

89. In fact, there was no indication that either physical or chemical restraints were necessary.

90. Despite this, at 03:44, Defendants Sedore and Muscara ordered Julie Doe to be injected with another 2mg of Ativan even though she was asleep.

91. Upon information and belief, Defendants Sedore and Muscara

17

excessively restrained Julie Doe for no medical purpose.

92. Even though Julie Doe was attacked, choked, thrown on the floor and rendered unconscious, Defendants Sedore and Muscara failed to conduct a physical examination of Julie Doe to ensure that she was not injured in the assault.

93. Defendants Sedore and Muscara did not order any imaging or other tests to ensure that Julie Doe was not injured following the assault.

Defendant McQuillan Falsely Accuses Julie Doe
And Requests that She Be Charged Criminally

94. Defendant McQuillan contacted the Abington Township Police Department to falsely allege that Julie Doe assaulted him.

95. Upon information and belief, Defendant McQuillan asked that Julie Doe be charged with a felony offense.

96. Upon information and belief, Defendant Saurman took Defendant McQuillan's report and filed assault charges against Julie Doe without conducting any sort of investigation or reviewing the video surveillance of the incident.

97. The following day Defendant Saurman filed a report falsely

claiming that Julie Doe was the aggressor and initiated contact with him.

**Defendants Mullen and Muscara Involuntarily Commit**
**Julie Doe Without a Legal, Medical or Factual Basis**

98. Defendants Mullen and Muscara filed a petition to have Julie Doe involuntarily committed even though there was no indication that she was an imminent danger to herself or others.

99. Neither Defendant Mullen nor Defendant Muscara mentioned Julie Doe's interaction with Defendants McQuillan and Czech in their documentation for the involuntary commitment.

100. Defendant Muscara examined Julie Doe at 6AM on the day following her assault.

101. At the time Defendant Muscara conducted his examination, Julie Doe was so over-sedated that she was "lethargic."

102. Julie Doe was evaluated by a crisis worker at 06:00.

103. Another hospital employee documented that Julie Doe was asleep at 06:00.

**McQuillan Brags About "Body Slamming" a "Bitch"**

104. After Defendant McQuillan's assault of Julie Doe, he bragged

19

to another security guard about "body slamming" a patient.

105. Specifically, he told the other guard that he "picked the bitch up and threw her on the floor." Other than referring to Julie Doe as a "bitch," Defendant McQuillan's statement was true.

106. A security shift supervisor (the "Whistleblower") heard about Defendant McQuillan's bragging and decided to review the security footage and Defendant McQuillan's report.

107. The Whistleblower was horrified to find that the security footage plainly contradicted Defendant McQuillan's report and revealed that Defendant McQuillan used excess force against Julie Doe and assaulted her.

108. The Whistleblower was convinced that Defendant McQuillan committed the crimes of aggravated assault, strangulation and unlawful restraint against Julie Doe.

Whistleblower Preserves Video and Reports Misconduct

109. The Whistleblower reported Defendant McQuillan's misconduct to his managers, including Defendant Payne, insisting that Defendant McQuillan be fired or at least put on leave pending an investigation.

110. Within 24 hours of learning about Defendant McQuillan's egregious misconduct, the Whistleblower requested that his supervisors, including the security captain, notify the police of Defendant McQuillan's misconduct and lies in his report to Defendant Saurman. Soon thereafter, the Whistleblower also contacted other managers and executives, including operations manager, security director, the senior security director, and the vice-president of security of Jefferson Health, and told them what the video revealed and requested that the police and district attorney be notified.

111. Rather than report Defendant McQuillan's misconduct and share the video with law enforcement, Defendant Payne restricted access to the surveillance video of the assault.

112. Jefferson Defendants and Defendant Abington Hospital took no remedial action against Defendant McQuillan or any of the other individuals involved in the assault or the cover up of the assault.

113. Further, Jefferson Defendants and Defendant Abington Hospital took no action to keep Defendant McQuillan away from patients.

114. Instead, they reprimanded and eventually fired the

21

Whistleblower.

115. Jefferson Defendants and Defendant Abington Hospital took no action to preserve the security footage and planned to keep the video "on track for destruction."

116. Fortunately, the Whistleblower recorded the video of Defendant McQuillan's assault to preserve it.

Department of Health Finds Excessive Force:
Hospital Placed on "Immediate Jeopardy"

117. After Defendant Payne and others declared that Defendant McQuillan's actions were justified and did not constitute excessive force, the Whistleblower made complaints internally through Jefferson Defendants' system of reporting ethics violations.

118. The Whistleblower also reported the defendants' misconduct to the Pennsylvania Department of Health ("DOH").

119. In response to the Whistleblower's report, on May 16, 2024 and May 17, 2024, the DOH conducted an onsite investigation.

120. DOH reviewed the security footage of Defendant McQuillan's assault of Julie Doe and found that Defendant McQuillan "initiat[ed] physical contact" with Julie Doe "which resulted in a struggle until the

patient was on the ground with the guard on top of the patient, holding patient by the neck/head until the patient was lifted onto a stretcher."

121. The DOH report found that Defendant McQuillan "failed to deescalate a situation with a patient and instead was provacative [*sic*] and used excessive force."

122. The DOH interviewed Defendant McQuillan who confirmed that Julie Doe was not physically or verbally aggressive.

123. Defendant McQuillan also confirmed that Julie Doe was "not going toward [an] exit."

124. As a result of its review of the security video and Defendant McQuillan's misconduct, the DOH issued a Statement of Deficiencies against Jefferson Abington Hospital.

125. The DOH determined that the hospital was not in compliance with 42 C.F.R. § 482.13, Patient Rights, and specifically failed to provide care in a safe setting.

126. The DOH concluded that the non-compliance constituted "Immediate Jeopardy," meaning the hospital's conduct created an imminent risk of serious injury, serious harm, serious impairment, or death to a patient.

127. "Immediate Jeopardy" is the highest level of regulatory noncompliance a hospital can receive.

128. The DOH further determined that the hospital failed to maintain a safe setting for the patient as required under federal Conditions of Participation.

129. The DOH report found not only that Defendant McQuillan's specific conduct was in violation of safety regulations but also that the failures of Jefferson Defendants and Defendant Abington Hospital were severe and systemic.

Whistleblower Meets with Defendants Saurman and John Doe 1

130. After DOH issued its report, the Whistleblower arranged to meet with Defendant Saurman at the Abington Township Police Department to show him the security video of the assault.

131. The Whistleblower showed Defendants Saurman and a supervisor within the Abington Township Police Department, John Doe 1, the security video of Defendant McQuillan assaulting Julie Doe.

132. Despite the Whistleblower previously specifically requesting that his superiors provide the video to the Abington Township Police Department, Defendants Saurman and his supervisor informed the

24

Whistleblower that no one from Abington Hospital supplied them with the video.

133. The Whistleblower allowed Defendants Saurman and John Doe 1 to copy the security video.

134. Defendants Saurman and John Doe 1 informed the Whistleblower that they would contact Abington Hospital to preserve the original video so that they could get a search warrant for the video.

135. The Whistleblower informed Defendants Saurman and John Doe 1 that the DOH found that Defendant McQuillan attacked Julie Doe and found that the hospital violated state regulations pertaining to patient safety.

136. During this meeting, Defendants Saurman and John Doe 1 informed the Whistleblower that an arrest warrant had been issued against Julie Doe.

137. Despite having seen the video and knowing that the charges against Julie Doe were baseless, Defendant Saurman, with the approval of John Doe 1,  maintained the false charges.

Julie Doe is Incarcerated Due to False Charges

138. Julie Doe subsequently received mail advising her of

25

Defendant Saurman's false criminal charges.

139. Julie Doe learned that there was an arrest warrant pending for her arrest.

140. She initially did not believe that the arrest warrant was real, so she contacted law enforcement to verify its authenticity.

141. Law enforcement informed Julie Doe that the arrest warrant was indeed real and that she must turn herself in on the charges.

142. Accordingly, Julie Doe surrendered to law enforcement and was incarcerated due to the false criminal charges Defendant Saurman brought and maintained, despite having seen the video and knowing that the charges against Julie Doe were baseless.

Defendant Saurman Withholds Exculpatory Video and
Refuses to Drop False Charges Against Julie Doe

143. Defendant Saurman charged Julie Doe with simple assault, a misdemeanor of the second degree (an offense punishable up to two (2) years of incarceration), and harassment, a summary offense (punishable up to ninety (90) days of incarceration).

144. Defendant Saurman alleged, based on false information provided to him by Defendant McQuillan, that Julie Doe was a "crisis

26

patient" who "refuse[d] to get back in her assigned bed."

145. According to Defendant Saurman's false allegations, Defendant McQuillan "reached out to direct [Julie Doe] to her bed when [Julie Doe] suddenly bit him on the left forearm, leaving a red mark."

146. Notwithstanding the video provided by the Whistleblower, which contradicted Defendant McQuillan's account and Defendant Saurman's sworn affidavit, Defendant Saurman refused to withdraw the false charges.

147. After Julie Doe was arrested, she was scheduled for a preliminary hearing on October 22, 2024.

148. Despite having reviewed the security video incident and knowing that Julie Doe committed no crime and actually was the victim, Defendant Saurman did not disclose the existence of the video, did not withdraw the charges, and continued to prosecute Julie Doe.

149. Upon information and belief, Defendant Saurman engaged in this course of action to protect Defendant McQuillan and the other defendants  from criminal and civil accountability for their actions.

150. Defendant Saurman offered to drop the misdemeanor charge in exchange for Julie Doe pleading guilty to the summary offense of

harassment.

151. At the time of her preliminary hearing, Julie Doe had no knowledge that there was a video of her interaction with Defendant McQuillan.

152. Despite possessing this clearly exculpatory evidence, Defendant Saurman chose not to provide Julie Doe or her counsel with a copy of the video.

153. Having been rendered unconscious by Defendants McQuillan and Czech and over-sedated by the Medical Defendants, Julie Doe had no independent recollection of her interaction with Defendant McQuillan.

154. Although she believed that she would not do what was alleged, she was in no position, without a copy of the video, to contest the charges.

155. As a result, Julie Doe pled guilty to harassment.

Julie Doe Learns of the Exculpatory
Video and has the Conviction Overturned

156. Months later, Julie Doe's counsel was contacted by *The Philadelphia Inquirer* about the DOH report and the video of the incident.

157. Until this time, neither Julie Doe nor her counsel was aware that the security video existed or of the DOH's findings.

158.  Based upon this new information, on February 24, 2025, Julie Doe's counsel filed a *nunc pro tunc*[5] petition for a summary appeal of her conviction.

159. On May 1, 2025, a Montgomery County judge heard Julie Doe's appeal.

160. In light of the exculpatory security video, the Montgomery County District Attorney's Office agreed to withdraw all charges.

Julie Doe Suffers Substantial Damages

161. As a direct and proximate result of Defendants' conduct, Julie Doe suffered significant physical, emotional, psychological, and reputational harm.

162. During Defendant McQuillan's and Czech's assault of her, Julie Doe was forcibly taken to the ground, restrained, and held by her head and neck. As a result, she experienced physical pain, soreness, and

---

[5] "*Nunc pro tunc*" literally means "now for then." In exceptional circumstances such as those that existed for Julie Doe, such an appeal may be made beyond the normal deadline for filing appeals in state court.

bodily injury.

163. Julie Doe was placed in physical restraints for approximately several hours, including after being chemically sedated and after repeatedly reporting pain. The prolonged restraint caused additional physical discomfort, distress, and trauma.

164. Julie Doe experienced humiliation and fear while being forcibly restrained in a hospital setting where she had sought care as a voluntary crisis patient.

165. As a result of the initiation and maintenance of criminal charges against her, Julie Doe suffered arrest, prosecution, public humiliation, and deprivation of liberty.

166. Julie Doe experienced severe emotional distress, anxiety, embarrassment, and exacerbation of her underlying mental health condition.

167. Julie Doe's trust in medical providers and law enforcement has been substantially impaired.

168. Despite the existence of surveillance video materially contradicting the allegations against Julie Doe, Defendants failed to amend, correct, or clarify Julie Doe's medical record.

169. Julie Doe's medical record continues to reflect that she was "violent" or engaged in assaultive behavior during the incident.

170. The presence of inaccurate and misleading information in Julie Doe's permanent medical record poses a continuing risk of harm to Julie Doe, including but not limited to:

    a. Future stigmatization in medical settings;

    b. Altered treatment decisions by healthcare providers;

    c. Heightened security responses in future hospital encounters;

    d. Reputational harm; and

    e. Emotional distress arising from the knowledge that her medical record contains false or misleading information.

171. Defendants' failure to correct the record has caused and continues to cause Julie Doe substantial anxiety, distress, and fear regarding future medical treatment.

172. As a direct and proximate result of Defendants' actions and omissions, Julie Doe has suffered and will continue to suffer damages including physical pain, emotional distress, humiliation, loss of liberty, reputational injury, and other compensable harms.

31

**COUNT ONE**[6]
Julie Doe v. Defendants McQuillan, Czech
and AEPA and Hospital Defendants
Assault (Pennsylvania Common Law)

173. Julie Doe repeats and realleges each of the above allegations as if fully repeated herein.

174. Defendants McQuillan and Czech intended to put Julie Doe in reasonable and immediate apprehension of a harmful or offensive contact with her body.

175. As a result of the actions of Defendants McQuillan and Czech, Julie Doe was put in reasonable and immediate apprehension of such contact.

176. At all relevant times, Defendants McQuillan and Czech were acting within the course and scope of their employment with Hospital Defendants and/or Defendant AEPA.

177. Accordingly, Hospital Defendants and Defendant AEPA are vicariously liable under the doctrine of respondeat superior for the tortious conduct of Defendants McQuillan and Czech.

---

[6] The different legal claims for relief are asserted in approximately the chronological order of the underlying events. Federal claims which support federal court jurisdiction are asserted in Counts Four, Six through Eight, and Ten.

## COUNT TWO
Julie Doe v. Defendants McQuillan, Czech
and AEPA and Hospital Defendants
Battery (Pennsylvania Common Law)

178. Julie Doe repeats and realleges each of the above allegations as if fully repeated herein.

179. Defendants McQuillan and Czech committed the acts described above with the intent to cause harmful or offensive contact with Julie Doe's body and/or with the intent to put Julie Doe in reasonable and immediate apprehension of a harmful or offensive contact with her body.

180. The actions of Defendants McQuillan and Czech resulted in a harmful and/or offensive contact with Julie Doe's body.

181. At all relevant times, Defendants McQuillan and Czech were acting within the course and scope of their employment with Hospital Defendants and/or Defendant AEP.

182.  Accordingly, Hospital Defendants and Defendant AEPA are vicariously liable under the doctrine of respondeat superior for the tortious conduct of Defendants McQuillan and Czech.

33

## COUNT THREE
Julie Doe v. Defendants McQuillan, Czech
and AEPA and Hospital Defendants
False Imprisonment (Pennsylvania Common Law)

183. Julie Doe repeats and realleges each of the above allegations as if fully repeated herein.

184. At the time of the events described above, Julie Doe was a voluntary patient in the Emergency Department and was not subject to an involuntary commitment or other lawful detention order.

185. Julie Doe was not physically aggressive, was not attempting to flee the hospital, and did not present an imminent danger to herself or others.

186. Defendant McQuillan intentionally stepped in front of Julie Doe, blocked her movement, and initiated physical contact with her.

187. Defendants McQuillan and Czech intentionally forced Julie Doe to the ground, physically restrained her, held her down by the head and neck area, and prevented her from leaving or moving freely.

188. Julie Doe was thereby confined within fixed boundaries against her will.

189. At the time of this confinement, there was no lawful privilege or justification authorizing Defendants McQuillan and Czech to restrain

34

Julie Doe.

190. The conduct of Defendants McQuillan and Czech was intentional and undertaken without reasonable grounds to believe such force or confinement was necessary.

191. As a direct and proximate result of Defendants McQuillan's and Czech's unlawful confinement, Julie Doe suffered physical injury, emotional distress, humiliation, loss of liberty, and other damages.

192. At all relevant times, Defendants McQuillan and Czech were acting within the course and scope of their employment with Hospital Defendants and/or Defendant AEP.

193.  Accordingly, Hospital Defendants and Defendant AEPA are vicariously liable under the doctrine of respondeat superior for the tortious conduct of Defendants McQuillan and Czech.

### COUNT FOUR
Julie Doe v. Defendants Saurman and John Doe 1
Malicious Prosecution (42 U.S.C. § 1983)

194. Julie Doe repeats and realleges each of the above allegations as if fully repeated herein.

195. Defendant Saurman initiated a criminal proceeding against Julie Doe, resulting in her arrest, physical seizure, and prosecution.

196. Defendant Saurman initiated such criminal proceedings with malice or for an improper purpose.

197. The criminal proceedings terminated in favor of Julie Doe.

198. Defendant Saurman's initiation of the criminal proceedings against Julie Doe proximately caused damage to Julie Doe.

199. Defendant Saurman's conduct therefore was a deprivation, under color of state law, of rights guaranteed to Julie Doe under the Fourth and Fourteenth Amendments of the United States Constitution.

200. Defendant Saurman's initiation and continuation of the criminal proceedings against Julie Doe proximately caused damage to Julie Doe

201. Defendant John Doe 1, after reviewing the exculpatory security video, failed to intervene and instead approved of Defendant Saurman's continuation of the criminal proceedings despite a lack of probable cause.

202. As a result of defendants Saurman's and John Doe 1's violation of Julie Doe's Constitutional rights, Julie Doe suffered substantial injuries and damage.

## COUNT FIVE
Julie Doe v. Defendants McQuillan, Saurman
John Doe 1, and AEPA and Hospital Defendants
Malicious Prosecution (Pennsylvania Common Law)

203. Julie Doe repeats and realleges each of the above allegations as if fully repeated herein.

204. Defendants McQuillan and Saurman initiated a criminal proceeding against Julie Doe, resulting in her arrest and prosecution.

205. Defendant McQuillan provided false information to law enforcement alleging that Julie Doe committed a criminal assault.

206. Defendant Saurman relied upon that information and swore to an affidavit of probable cause, initiating formal criminal charges.

207. At the time the charges were initiated and maintained, Defendants lacked probable cause to believe Julie Doe committed a crime.

208. Defendants Saurman and John Doe 1 subsequently learned that the facts alleged were false, and that Julie Doe had not committed any crime. Nonetheless, Defendants Saurman and John Doe 1 did not disclose the exculpatory evidence and instead continued the prosecution knowing that Julie Doe was innocent.

209. Defendants acted with malice or for an improper purpose,

including but not limited to improperly shielding Defendant McQuillan from civil and criminal liability and justifying the use of force.

210. The criminal proceedings terminated in Julie Doe's favor when the charges were withdrawn after review of surveillance video evidence.

211. As a direct and proximate result of Defendants' conduct, Julie Doe suffered arrest, prosecution, deprivation of liberty, emotional distress, reputational harm, and other damages.

212. At all relevant times, Defendant McQuillan acted within the course and scope of his employment with Hospital Defendants and/or Defendant AEP.

213. Accordingly, Hospital Defendants and Defendant AEPA are vicariously liable under the doctrine of respondeat superior for the tortious conduct of Defendant McQuillan.

## COUNT SIX
Julie Doe v. Defendants Saurman and John Doe 1
False Arrest (42 U.S.C. § 1983)

214. Julie Doe repeats and realleges each of the above allegations as if fully repeated herein.

215. Defendant Saurman issued an arrest warrant against Julie

38

Doe, without any probable cause or legal justification.

216. Defendants Saurman and John Doe 1 subsequently learned that the arrest warrant lacked probable cause.

217. Julie Doe was detained because of the arrest warrant.

218. As a result of Defendant Saurman's false arrest warrant and Defendant John Doe 1's failure to intervene to withdraw the false arrest warrant, which led to the false imprisonment of Julie Doe, she suffered substantial injuries and damage.

## COUNT SEVEN
Julie Doe v. Defendants Saurman and John Doe 1
Failure to Disclose Exculpatory Evidence (42 U.S.C. § 1983)

219. Julie Doe repeats and realleges each of the above allegations as if fully repeated herein.

220. Defendant Saurman initiated criminal charges against Julie Doe based upon allegations that Julie Doe assaulted hospital security personnel.

221. After charges were filed, Defendants Saurman and John Doe 1 personally reviewed hospital surveillance video depicting the incident at issue.

222. The surveillance video was materially exculpatory in that it

contradicted the factual allegations supporting probable cause and demonstrated that Julie Doe did not initiate the physical confrontation.

223. Defendants Saurman and John Doe 1 knew that the video was favorable to Julie Doe and material to the pending criminal prosecution.

224. Despite possessing this materially exculpatory evidence, Defendants Saurman and John Doe 1 chose not to disclose the video to Julie Doe or her counsel prior to Julie Doe's entry of a guilty plea.

225. Defendant Saurman further failed to correct or amend the affidavit of probable cause in light of the exculpatory video evidence.

226. As a direct and proximate result of Defendants Saurman's and John Doe 1's affirmative choice not to disclose materially exculpatory evidence, and because she had been rendered unconscious by Defendants McQuillan and Czech and over-sedated and thus had no independent recollection of the events, Julie Doe entered a guilty plea without knowledge of evidence that undermined the basis of the charges.

227. The non-disclosure of the video evidence deprived Julie Doe of a meaningful opportunity to defend herself and resulted in a

deprivation of liberty.

228. Defendants' conduct was intentional, malicious, or undertaken with reckless disregard for Julie Doe's constitutional rights.

229. By not disclosing materially exculpatory evidence, Defendants violated Julie Doe's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

230. As a result of Defendants' non-disclosure of exculpatory video evidence, Julie Doe suffered substantial injuries and damage.

**COUNT EIGHT**
Julie Doe v. Defendants McQuillan, Payne,
Saurman and John Doe 1
Conspiracy (42 U.S.C. § 1983)

231. Julie Doe repeats and realleges each of the above allegations as if fully repeated herein.

232. Defendant McQuillan provided law enforcement with a narrative alleging that Julie Doe assaulted him.

233. Defendant Saurman relied upon that narrative to initiate criminal charges against Julie Doe without reviewing readily available surveillance video documenting the incident.

234. The surveillance video objectively depicted the encounter and

41

materially contradicted the allegations supporting the charges.

235. Defendant Payne restricted access to the surveillance video of the assault and in furtherance of a cover-up declared that Defendant McQuillan's actions were justified and did not constitute excessive force.

236. After criminal charges were initiated, Defendants Saurman and John Doe 1 personally reviewed the surveillance video.

237. Despite knowledge that the video undermined the factual basis for the charges, Defendants Saurman and John Doe 1 chose not to withdraw the charges and failed to disclose the video prior to Julie Doe's entry of a guilty plea.

238. Defendants Saurman and John Doe 1knew that the surveillance video documented the encounter and knew that the criminal charges were premised upon their narrative.

239. By continuing to support and maintain the prosecution despite the existence of objective video evidence, Defendants Saurman John Doe 1, and McQuillan reached a tacit understanding to allow criminal proceedings to continue notwithstanding materially exculpatory evidence.

240. In furtherance of this agreement, Defendants Saurman,

42

Payne, John Doe 1 and McQuillan:

   a. Initiated and maintained criminal charges;

   b. Failed to correct materially false or misleading statements;

   c. Failed to disclose exculpatory video evidence;

   d. Restricted access to the video which showed in objective the underlying events;

   e. Allowed the prosecution to proceed; and

   f. Allowed Julie Doe to plead guilty to baseless charges.

241. As a direct and proximate result of Defendants Saurman's, McQuillan's, Payne's and John Doe 1's concerted actions, Julie Doe was deprived of liberty and denied her constitutional rights under the Fourth and Fourteenth Amendments.

242. Defendants Saurman's, McQuillan's, Payne and John Doe 1's actions were intentional, malicious, or undertaken with reckless disregard for Julie Doe's rights.

**COUNT NINE**

Julie Doe v. Defendants McQuillan, Czech,
Payne, Saurman and John Doe 1
Conspiracy (Pennsylvania Common Law)

243. Julie Doe repeats and realleges each of the above allegations as if fully repeated herein.

43

244. Defendants McQuillan, Czech, Payne, Saurman and John Doe 1 combined, conspired, and agreed—expressly or tacitly—to commit unlawful acts against Julie Doe, including the use of unjustified force and the initiation and maintenance of baseless criminal charges.

245. Defendants McQuillan and Czech acted in concert to physically restrain Julie Doe without lawful justification, forcing her to the ground, holding her down, choking her into unconsciousness, and confining her against her will despite the absence of an imminent threat.

246. Defendant Payne restricted access to the surveillance video of the assault and in furtherance of a cover-up declared that Defendant McQuillan's actions were justified and did not constitute excessive force.

247. Thereafter, Defendant McQuillan provided law enforcement with a false narrative alleging that Julie Doe committed a criminal assault.

248. Defendant Saurman and John Doe 1 relied upon that narrative to initiate criminal proceedings without reviewing surveillance video documenting the incident.

249. Defendant Czech knew that Julie Doe had been restrained

and that criminal charges were being pursued based upon the version of events advanced by Defendants McQuillan and himself.

250. After Defendants Saurman and John Doe 1 reviewed surveillance video that materially contradicted the factual basis for the charges, Defendants continued to support and maintain the prosecution.

251. The object of the conspiracy was to justify and shield Defendants McQuillan and Czech from civil and criminal liability arising from their use of force and to subject Julie Doe to arrest, prosecution, and deprivation of liberty.

252. In furtherance of this conspiracy, Defendants McQuillan, Czech, Payne, Saurman and John Doe 1:

a. Used unjustified and excessive physical force against Julie Doe;

b. Confined Julie Doe without lawful authority;

c. Restricted access to the video which showed in objective the underlying events;

d. Initiated and maintained criminal charges despite materially exculpatory evidence;

e. Failed to correct false or misleading statements regarding the incident; and

f.  Permitted criminal proceedings to continue notwithstanding the absence of probable cause.

45

253. Defendants acted with malice and with the specific intent to injure Julie Doe, including by depriving her of liberty, causing humiliation, and exposing her to criminal prosecution.

254. As a direct and proximate result of Defendants' concerted actions, Julie Doe suffered physical injury, emotional distress, reputational harm, deprivation of liberty, and other damages.

255. The foregoing conduct constitutes civil conspiracy under Pennsylvania law and was undertaken in furtherance of the underlying torts of assault, battery, false imprisonment, and malicious prosecution.

## **COUNT TEN**
Julie Doe v. Hospital Defendants and Defendant AEPA
Discrimination (Rehabilitation Act)

256. Julie Doe repeats and realleges each of the above allegations as if fully repeated herein.

257. Julie Doe is an individual with a disability within the meaning of Section 504 of the Rehabilitation Act, in that she was experiencing a serious mental health condition (bipolar disorder and/or complex post-traumatic stress disorder) that substantially limited one or more major life activities, including thinking, regulating emotions, and interacting with others.

258. Hospital Defendants and Defendant AEPA are entities that receives federal funding, including but not limited to Medicare and/or Medicaid funding, and are therefore subject to Section 504 of the Rehabilitation Act.

259. At all relevant times, Julie Doe was a patient in Hospital Defendants' Emergency Department and under the care of Defendant AEPA physicians and staff and was otherwise qualified to receive emergency medical services and mental health care.

260. Hospital Defendants and Defendant AEPA were aware, or reasonably should have been aware, that Julie Doe was experiencing a mental health crisis and that her behavior was related to her disability, and/or they regarded Julie Doe as having a disability.

261. Despite this knowledge, Hospital Defendants and Defendant AEPA failed to provide reasonable accommodations appropriate to a patient in mental health crisis, including but not limited to:

a. Utilizing de-escalation techniques consistent with crisis intervention training;

b. Ensuring clinical supervision of security personnel during patient encounters;

c. Implementing appropriate behavioral health protocols; and

d. Preventing the unnecessary use of force.

47

262. Instead, Hospital Defendants and AEPA, through their agents and employees, escalated the situation and permitted or facilitated the use of unnecessary and excessive physical force against Julie Doe.

263. Hospital Defendants' and AEPA's actions denied Julie Doe the benefit of receiving medical care in a safe and non-discriminatory setting and subjected her to discrimination by reason of her disability.

264. Hospital Defendants' and AEPA's conduct was intentional, reckless, or demonstrated deliberate indifference to Julie Doe's federally protected rights.

265. As a direct and proximate result of Hospital Defendants' and AEPA's violation of Section 504, Julie Doe suffered substantial injuries and damage, including but not limited to physical injury, emotional distress, humiliation, deprivation of liberty, and other damages.

266. Julie Doe seeks equitable relief to remedy the ongoing effects of Hospital Defendants' and AEPA's discriminatory conduct, including correction of inaccurate and stigmatizing medical records.

48

## **COUNT ELEVEN**
Julie Doe v. Hospital Defendants and Defendant AEPA
Corporate Negligence (Pennsylvania Common Law)

267. Julie Doe repeats and realleges each of the above allegations as if fully repeated herein.

268. At all relevant times, Julie Doe was a patient in the Emergency Department of Jefferson Abington Hospital.

269. As a hospital providing emergency and mental health services, Hospital Defendants and Defendant AEPA owed Julie Doe non-delegable duties, including but not limited to the duties recognized in *Thompson v. Nason Hospital*, 591 A.2d 703 (Pa. 1991) to ensure patient safety and quality care.

270. Hospital Defendants and Defendant AEPA breached their direct institutional duties by failing to:

  a. Ensure physicians only seek to involuntarily commit patients based on sufficient clinical basis;

  b. Ensuring patients who are assaulted while hospitalized undergo appropriate physical examination, neurological assessment, and diagnostic evaluation;

  c. Maintain accurate documentation and medical recordkeeping;

  d. Correct false documentation and medical records;

  e. Formulate, adopt, and enforce adequate policies governing the use of physical and chemical restraints on mental health

49

patients;

f.  Ensure that physical restraints were used only when medically necessary and discontinued at the earliest safe opportunity;

g.  Provide adequate training to security personnel regarding crisis intervention, de-escalation, and restraint protocols in a clinical setting;

h.  Ensure appropriate medical supervision and reassessment of restrained patients;

i.  Prevent unnecessary or excessive use of force against patients experiencing a mental health crisis;

j.  Adequately oversee and supervise security personnel operating within the Emergency Department; and

k.  Ensure compliance with federal Conditions of Participation and Patient Rights regulations, including 42 C.F.R. § 482.13.

271. As a result of these systemic failures, Julie Doe was subjected to unjustified physical force and prolonged restraint without lawful or medical justification.

272. The failures described above were a substantial factor in causing Julie Doe's injuries.

273. As a direct and proximate result of Hospital Defendants' and Defendant AEPA's corporate negligence, Julie Doe suffered physical injury, pain, emotional distress, humiliation, and other damages.

**COUNT TWELVE**
Julie Doe v. Medical Defendants, Hospital
Defendants and Defendant AEPA
Medical Negligence (Pennsylvania Common Law)

274. Julie Doe repeats and realleges each of the above allegations as if fully repeated herein.

275. A provider–patient relationship existed between Julie Doe and employees and agents of Hospital Defendants (Defendants Abington Memorial Hospital, Thomas Jefferson University, Thomas Jefferson University Hospital, Inc., and Jefferson Health – Northeast Foundation) and/or Defendant AEPA, including but not limited to Medical Defendants (Defendants Mullen, Muscara, Sedore), during her presentation to the Emergency Department.

276. Employees and agents of Hospital Defendants and/or Defendant AEPA, including but not limited to Medical Defendants, owed Julie Doe a duty to exercise the degree of care, skill, and judgment ordinarily exercised by reasonably prudent emergency medicine and psychiatric providers under similar circumstances.

277. Employees and agents of Hospital Defendants and/or Defendant AEPA, including but not limited to Medical Defendants, breached the applicable professional standard of care, including but not

limited to the following:

    a. Ordering or approving involuntary commitment without sufficient clinical basis or documented evidence of a clear and present danger;

    b. Failing to conduct an adequate psychiatric evaluation before initiating or approving involuntary commitment procedures;

    c. Failing to properly assess Julie Doe following the use of physical force and restraint;

    d. Failing to conduct appropriate physical examination, neurological assessment, and diagnostic evaluation after Julie Doe was taken to the ground and restrained;

    e. Failing to respond appropriately to Julie Doe's complaints of pain while restrained;

    f. Failing to discontinue restraints at the earliest medically appropriate time, including after chemical sedation;

    g. Failing to ensure that restraint decisions were medically driven;

    h. Documenting inaccurate, misleading, or unsupported characterizations of Julie Doe as attempting to elope from the emergency department and/or "verbally and physically aggressive" despite the availability of objective evidence contradicting such characterizations;

    i. Failing to correct or amend the medical record after becoming aware of materially contradictory evidence.

278. The above deviations from accepted medical standards were a substantial factor in causing Julie Doe's prolonged restraint, unlawful commitment, physical injury, emotional distress, and reputational harm.

52

279. As a direct and proximate result of the professional negligence of employees and agents of Hospital Defendants and/or Defendant AEPA, including but not limited to Medical Defendants, Julie Doe suffered physical injury, psychological trauma, exacerbation of her mental health condition, loss of liberty, and other damages.

280. At all relevant times, Medical Defendants as well as other employees and agents of Hospital Defendants and/or Defendant AEPA were acting within the course and scope of their employment with Hospital Defendants and/or Defendant AEPA.

281. At all relevant times, Medical Defendants, as doctors and/or physician assistants, oversaw other employees and agents of Hospital Defendants and/or Defendant AEPA who were involved in Julie Doe's care and who were acting within the course and scope of their employment with Hospital Defendants and/or Defendant AEPA.

282.  Accordingly, Medical Defendants, Hospital Defendants, and Defendant AEPA are vicariously liable under the doctrine of respondeat superior for the professional negligence of the employees and agent Hospital Defendants and/or Defendant AEPA who were involved in Julie Doe's care.

WHEREFORE, plaintiff demands judgment as follows:

A.   For Counts One through Nine and Counts Eleven and Twelve, an amount to be determined at trial, including punitive damages, plus interest;

B.   For Count Ten, an amount to be determined at trial, plus interest;

C.   An Order directing Hospital Defendants to correct, amend, or clarify Julie Doe's medical records to accurately reflect the events of April 23, 2024 and April 24, 2024;

D.   For costs and disbursements incurred in this action;

E.   For attorneys' fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 794a(b); and

F.   Any such other relief as the Court may deem just and proper.

Respectfully submitted,

DYLLER & SOLOMON, LLC.

/s/ Barry H. Dyller, Esq.
88 North Franklin Street
First Floor
Wilkes-Barre, PA 18701

54

(570) 829-4860

MATTHEW L. CLEMENTE, ESQ.

/s/ Matthew L. Clemente, Esq.
88 North Franklin Street
Second Floor
Wilkes-Barre, PA 18701
(570) 829-4860

Attorneys for Plaintiff

<u>Jury Demand</u>

Plaintiff demands a trial by jury on all issues, except for the limited equitable relief sought.

55