**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JULIE DOE, Plaintiff, v. BRYAN McQUILLAN, *et al.*, Defendants. | : | CIVIL ACTION No. 26-cv-2302-JMY |

# MEMORANDUM

**Younge, J.** **October 7, 2026**

This case involves a 2024 altercation in the emergency department of Abington Hospital. Plaintiff Julie Doe[1] arrived at the hospital around 6 p.m. on April 23, seeking treatment in relation to a trauma response. She was treated uneventfully for several hours by medical personnel—but just after 11 p.m., on her way to the bathroom, security guards Bryan McQuillan and Ryan Czech initiated a struggle, tackling Doe and rendering her unconscious.

After the altercation, Doe's doctors sedated and restrained her and added notes to her chart reflecting that she was aggressive and attempted to escape the hospital. For his part, McQuillan later reported to responding police officer Earl Saurman that Doe had bitten him. Thereafter, Saurman charged Doe with assault and harassment. Doe later pled guilty to harassment in exchange for having the assault charge dropped.

Only later did Doe discover that there was a video of the incident that she now claims exonerated her and showed that McQuillan was in fact the aggressor. She alleges that Saurman not

[1] Plaintiff asserts the right to proceed under the pseudonym "Julie Doe" under *Doe v. Megless*, 654 F.3d 404 (3d Cir. 2011). Defendants have not opposed this assertion.

only viewed the video after he charged Doe, but also pursued the case anyway and refused to drop the charges. And she alleges that Charles Payne, Abington Hospital's security director, restricted access to the video rather than sharing it with the police.

Doe brings twelve claims against the Medical Defendants (Mullen, Muscara, and Sedore), Security Defendants (McQuillan, Czech, and Payne), Hospital Defendants (Abington Hospital, Thomas Jefferson University, Thomas Jefferson University Hospitals, Jefferson Health Corporation, Jefferson Health – Northeast Foundation, and Abington Emergency Physician Associates), Saurman, and an unidentified police officer.[2] Before the Court are Defendants' motions to dismiss Doe's claims. (ECF Nos. 32, 37, 44). For the following reasons, Defendants' motions are granted without prejudice as to Counts 4–9 and denied as to all other counts.[3]

## I. BACKGROUND

### A. Facts[4]

On April 23, 2024, Julie Doe went to the Abington Hospital Emergency Room to seek treatment in relation to an undisclosed trauma response. (ECF No. 1 ¶¶ 40–41). She arrived around 6 p.m. and was treated by hospital staff over the next few hours, undergoing a blood test, electrocardiogram, IV placement, administration of medications, and a manic behavior assessment. (*Id.* ¶¶ 42–47). Donald Mullen was Doe's attending doctor until 9:55 p.m., when physician assistant Madeleine Bree Sedore took over. (*Id.* ¶¶ 51–52). Although Doe was "demonstrating manic-type speech," the records of her visit reflected that she was "medically

[2] Named in the Complaint as "John Doe 1."

[3] The Court finds this matter appropriate for resolution without oral argument. Fed. R. Civ. P. 78; L.R. 7.1(f).

[4] The following facts are set forth in the Amended Complaint and are viewed in the light most favorable to the Plaintiff.

stable," "neurologically intact," and "resting comfortably," with "no documentation of suicidal ideation, homicidal ideation, aggression, risk of flight, or behavior indicating imminent danger to herself or others." (*Id.* ¶¶ 47–50).

Just after 11 p.m., Doe got up to use the bathroom. (*Id.* ¶ 53). She left her room wrapped in a blanket, making her way down an emergency room hallway—followed by two security guards, Bryan McQuillan and Ryan Czech. (*Id.* ¶¶ 54–57). Unprovoked, McQuillan "stepped directly in front of her" and "initiated a struggle with [her], thrusting his forearm into her ribs and shoving her into a wall." (*Id.* ¶¶ 58–59). He "wrapped his arm around [her] chest, grabbed her by the shoulders," "violently jerked her torso," and, with Czech's help, "wrestled [her] to the ground and fell on her." (*Id.* ¶¶ 60–62). McQuillan pinned her to the floor, and the two security guards held her there until she was unconscious. (*Id.* ¶¶ 63–64). They lifted her onto a gurney and placed her—still unconscious—in physical restraints on the instructions of Dr. Joseph Muscara. (*Id.* ¶¶ 64–65, 82). No Defendant, or agent or employee thereof "performed any imaging to determine whether Julie Doe was injured" in the struggle with the security guards. (*Id.* ¶ 66).

Within minutes of this incident, hospital staff began to memorialize their version of the struggle. Sedore placed a note in Doe's file that she "attempt[ed] to elope from the emergency department," was "verbally and physically aggressive," and "spit at [McQuillan] and attempted to punch and hit him." (*Id.* ¶ 68). Mullen amended his earlier note to indicate that Doe "attempted to leave the emergency department" and required physical restraints. (*Id.* ¶¶ 70–73). Sedore and Muscara (who were now in charge of Doe's care) also ordered additional sedatives, which were administered at 11:48 p.m., about five hours after Doe had received earlier sedation. (*Id.* ¶¶ 83–84). By 12:15 a.m., Doe was asleep; an hour later, she was "[a]wake[, c]alm[, c]ooperative," and "[c]omplaining in pain from [the] restraints"—but the restraints were not removed. (*Id.* ¶¶ 85–87).

At 3:44 a.m.—while Doe was asleep—Sedore and Muscara ordered her to be injected with another round of Ativan. (*Id.* ¶ 90). Later, they filed a petition to have her involuntarily committed. (*Id.* ¶ 98).

McQuillan also contacted the Abington Township Police Department and requested that Doe be charged with felony assault against him. (*Id.* ¶¶ 94–95). Without investigating or reviewing surveillance footage, officer Earl Saurman filed charges against Doe: simple assault, a misdemeanor; and harassment, a summary offense. (*Id.* ¶¶ 96, 143). When Doe surrendered to law enforcement on the charges, Saurman offered to drop the assault charge if Doe pled guilty to harassment. (*Id.* ¶¶ 142, 150). At that time, Doe could not remember what had happened, and she ultimately pled guilty to harassment as Saurman suggested. (*Id.* ¶¶ 153–55). At no point did Saurman inform Doe of a critical fact that might have changed everything: he had a video that may have exonerated her. (*Id.* ¶¶ 148, 151–52).

The video was discovered shortly after the incident by a hospital security shift supervisor (the "Whistleblower"). (*Id.* ¶ 106). The Whistleblower heard that McQuillan was bragging about "body slamming" Doe, and that he "picked the bitch up and threw her on the floor." (*Id.* ¶¶ 104–05). The Whistleblower reviewed security footage of McQuillan's attack, finding that it contradicted McQuillan's assertions that Doe had attacked him first. (*Id.* ¶ 107). He reported McQuillan to his managers (including director of security Charles Payne), as well as to other operations and security managers at the hospital. (*Id.* ¶¶ 109–10). But instead of sharing the video with law enforcement, Payne restricted access to it—and instead of taking action against McQuillan, the hospital reprimanded and ultimately fired the Whistleblower. (*Id.* ¶¶ 111–114).

The Whistleblower escalated his findings higher, filing a report with the Pennsylvania Department of Health ("DOH"). (*Id.* ¶ 118). DOH conducted an on-site investigation, reviewed

the footage of the altercation, and interviewed McQuillan, who confirmed that Doe was "not physically or verbally aggressive" and was "not going toward [an] exit." (*Id.* ¶¶ 119–20, 122–23). DOH subsequently issued a report that concluded McQuillan "failed to deescalate a situation with a patient and instead was prov[o]cative and used excessive force." (*Id.* ¶ 121). DOH also issued a Statement of Deficiencies against the hospital, concluding that it failed to provide care in a safe setting (in violation of 42 C.F.R. § 482.13, Patient Rights); that the hospital's conduct posed an "imminent risk of serious injury, serious harm, serious impairment, or death to a patient"; and that the hospital's violations were "severe and systemic." (*Id.* ¶¶ 124–29).

After DOH issued its report, the Whistleblower met with Officer Saurman and an unidentified supervisor to show them the security footage that exonerated Doe. (*Id.* ¶¶ 130–31). The officers copied the video, which despite the Whistleblower's requests had not been previously shared with the police department. (*Id.* ¶¶ 132–33). But Saurman did not drop the case against Doe; leading up to her guilty plea, he did not even tell her that a video of the altercation existed. (*Id.* ¶¶ 137, 146, 148, 151–52).

Only months later, when the *Philadelphia Inquirer* contacted Doe about the DOH report, did she learn that a video of the incident existed. (*Id.* ¶¶ 156–57). In light of the video's discovery, Doe filed a petition to appeal her conviction of harassment, and the Montgomery County District Attorney agreed to withdraw all charges. (*Id.* ¶¶ 158–60).

**B. Procedural History**

On April 9, 2026, Doe filed a complaint against all Defendants, asserting various claims under state and federal law for assault, battery, false imprisonment, malicious prosecution, false arrest, conspiracy, discrimination, corporate and medical negligence, and failure to disclose exculpatory evidence. Defendants filed three separate motions to dismiss Doe's claims: the

Hospital and Security Defendants on May 11, 2026; AEPA and the Medical Defendants on May 14, 2026; and Saurman on June 22, 2026. (ECF Nos. 32, 37, 44). Replies followed. (ECF Nos. 42–43, 45–46).

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must sufficiently plead facts that, if accepted as true and interpreted in the light most favorable to the plaintiff, "state a claim to relief that is plausible on its face." *McTernan v. City of York*, 577 F. 3d 521, 526, 530 (3d. Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Likewise, the tenet that a court must accept as true all the allegations in a complaint is inapplicable to legal conclusions. *Iqbal*, 556 U.S. at 678. Pleadings that offer only "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## III. DISCUSSION

### A. Counts 1–3: Assault, Battery, and False Imprisonment

Doe brings claims under Pennsylvania law for assault, battery, and false imprisonment against McQuillan, Czech, AEPA, and the Hospital Defendants. (ECF No. 1 at 32–35). Plaintiff

adequately pleads the elements of each tort,[5] and Defendants therefore argue instead that they are immune from civil liability. The Court disagrees.

Defendants point out that the Pennsylvania Mental Health Procedures Act ("MHPA") "provides broad immunity from civil liability for individuals and entities engaged in mental health evaluation, treatment, or detention." (ECF No. 32-2 at 10; *see also* ECF No. 37-1 at 6). But the MHPA carves out from immunity conduct that rises to the level of "willful misconduct or gross negligence." 50 P.S. § 7114(a). Gross negligence is conduct that is "flagrant, grossly deviating from the ordinary standard of care," and willful misconduct exists where "the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong." *Albright v. Abington Memorial Hospital*, 696 A.2d 1159, 1164 (Pa. 1997); *Benn v. Univ. Health Sys.*, 371 F.3d 165, 174–75 (3d Cir. 2004) (quoting *Krivijanski v. Union R. Co.*, 515 A.2d 933, 937 (Pa. Super. 1986)).

The Court finds that if proven, McQuillan and Czech's actions could lead a reasonable jury to conclude they rise to the level of gross negligence or willful misconduct. Far from reciting mere "conclusory labels" (ECF No. 32-2 at 11), Plaintiff has alleged a detailed course of conduct that amounts to an unprovoked attack on a patient calmly walking to the bathroom. If true—and the Court must accept it as true for purposes of this motion—such conduct would be a gross deviation

[5] "To prove her claim of assault, under Pennsylvania law, Plaintiff must show that a particular Defendant intentionally caused an imminent apprehension of a harmful or offensive bodily contact in Plaintiff . . . To prove her claim of battery, Plaintiff must establish that a particular Defendant intended to cause a harmful or offensive contact to Plaintiff, or an imminent apprehension of such contact in Plaintiff, and that such contact with Plaintiff resulted." *Lakits v. York*, 258 F. Supp. 2d 401, 407 (E.D. Pa. 2003). "The elements of false arrest/false imprisonment are: (1) the detention of another person (2) that is unlawful." *Manley v. Fitzgerald*, 997 A.2d 1235, 1241 (Pa. Commw. 2010).

from the standard of care owed to Plaintiff. Defendants' motions to dismiss Counts 1–3 are denied.[6]

### B. Count 4–6: Malicious Prosecution and False Arrest

Doe brings malicious prosecution claims under Pennsylvania law against Saurman and John Doe 1, as well as against McQuillan, Czech, AEPA, and the Hospital Defendants. (ECF No. 1 at 37–38). She also brings claims under 42 U.S.C. § 1983 for malicious prosecution and false arrest against Saurman and John Doe 1. (ECF No. 1 at 35–36, 38–41). Because Saurman had probable cause to charge Doe, the Court grants dismissal on these claims.

A claim for false arrest or malicious prosecution requires a finding that there was no probable cause to initiate criminal proceedings against the plaintiff.[7] To summarize, "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Understandably, "a positive identification by a victim witness, without more, would usually be sufficient to establish probable cause." *Wilson v. Russo*, 212 F.3d 781, 790 (3d Cir. 2000). That is just what we have here: McQuillan identified Doe to Saurman, and Saurman initiated proceedings against her. Without more, Saurman had probable cause to do so, and Doe's claims for false arrest and malicious prosecution fail.

[6] Defendant AEPA separately seeks to dismiss Counts 1–3 against it based on "factual insufficiency," arguing that AEPA did not employ McQuillan or Czech. (ECF No. 37-1 at 7). But Plaintiff has alleged that they *did* employ or may have employed McQuillan and Czech, and at this stage the Court is bound to accept Plaintiff's factual assertions as true. (ECF No. 1 ¶¶ 24, 26).

[7] In malicious prosecution actions, the inquiry turns on whether probable cause existed at the time criminal proceedings were initiated. *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007). In false arrest actions predicated on an arrest pursuant to a warrant, the inquiry turns on whether probable cause existed at the time of the warrant application. *Wilson v. Russo*, 212 F.3d 781, 786–7 (3d Cir. 2000). Here, the relevant moment is the same: when Saurman filed charges against Doe and applied for a warrant against her.

Resisting this conclusion, Doe makes several contrary arguments. First, Doe argues that, even with a positive victim-witness identification, an officer "is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Id*. She argues that Saurman was required to investigate McQuillan's complaint further before making an arrest. In essence, she argues that Saurman was bound to credit the exculpatory video when assessing whether McQuillan's statements gave him probable cause to charge her. But as Plaintiff admits, when Saurman charged Doe, he had not seen the video and did not know it existed. What he did have—a clear statement from a victim witness—was enough to establish probable cause.

Next, Doe argues that probable cause must persist throughout her criminal proceedings to avoid liability for malicious prosecution. Because Saurman watched the exculpatory video before she turned herself in, she says, probable cause dissipated at that point. But that is not the law in Pennsylvania. As discussed above, probable cause is assessed at the moment criminal proceedings are *initiated*, not continuously re-assessed throughout a case's life. Doe cites contrary authority from the Middle District of Pennsylvania, but those cases appear to incorporate *New York* state tort law, which allows malicious prosecution actions to proceed where a prosecution was "commenced *or continued*" without probable cause. *Bowie v. Hower*, 2026 U.S. Dist. LEXIS 15231 at *19 (M.D. Pa. Jan. 28, 2026) (*citing Naslanic v. Gula*, No. 15-cv-2208, 2018 U.S. Dist. LEXIS 66978 (M.D. Pa. Mar. 29, 2018) (*citing Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003))).[8]

[8] Even if Pennsylvania law allowed malicious prosecution actions where probable cause dissipated at some point during the proceedings, that requirement is not "clearly established" by Supreme Court or Third Circuit precedent, and Saurman would be entitled to qualified immunity. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021).

Finally, Doe argues that McQuillan's report did not establish a "fair probability" that Doe intended to bite McQuillan during the altercation, because she was a mental health patient at the time. *Harvard v. Cesnalis*, 973 F.3d 190, 199–200 (3d Cir. 2020). This is fatal, she says, because it does not establish probable cause for the assault and harassment charge brought against her. (ECF No. 45 at 14). The Court disagrees; a victim-witness's report that an individual bit him during an altercation establishes at least a fair probability that she intended to do so.

Defendants' motions to dismiss Counts 4–6 are granted without prejudice.

**C. Count 7: Failure to Disclose Exculpatory Evidence**

Doe asserts a § 1983 claim against Saurman for the failure to disclose exculpatory evidence—the exculpatory video. But even if there were a requirement to disclose exculpatory evidence prior to a guilty plea, Saurman would have qualified immunity because that right is not clearly established: the Supreme Court and Third Circuit have not addressed the issue, and the circuits that have disagree on whether such a requirement exists. *U.S. v. Isip*, U.S. Dist. LEXIS 167262, at *16 (D. Del. Aug. 27, 2025); *Miller v. Gettel*, 2023 WL 2945340, at *7 n.5 (6th Cir. Apr. 14, 2023) (collecting cases).

Doe's response attempts to recast her claim as a fabrication of evidence claim. But the complaint does not plead fabrication of evidence, and even if it did it is not clear that it pleads any facts suggesting Saurman fabricated any evidence at all. Defendant's motion to dismiss Count 7 is granted without prejudice, with leave to amend.

**D. Counts 8 and 9: Conspiracy**

Doe brings claims for conspiracy—under § 1983 against McQuillan, Payne, Saurman, and John Doe 1, and under Pennsylvania law against the same defendants as well as Czech. (ECF No.

1 at 41–46). Because Doe has not pled facts that plausibly establish the existence of an agreement between participants, the Court grants dismissal of Doe's conspiracy claims.

Both conspiracy under § 1983 and civil conspiracy under Pennsylvania law require a showing of an agreement. "[C]oncerted action, without more, cannot suffice to state a conspiracy claim." *Watson v. Sec'y Pennsylvania Dep't of Corr.*, 436 F. App'x 131, 137 (3d Cir. 2011). "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557.

That is what Doe pleads. In sum, her allegations are that McQuillan made a (false) police report, Saurman pursued charges based on that report, Payne restricted access to the exculpatory video of McQuillan's attack, and Saurman refused to drop the charges against Doe even after viewing the video. What Doe does *not* plead is any non-conclusory allegation that they took those actions pursuant to an agreement to shield McQuillan from liability. Doe does not allege that Saurman knew he was charging Doe on false premises; that Saurman had any contact with McQuillan following his initial report; or that Payne ever spoke to McQuillan or Saurman at all. Though all these actions were to Doe's detriment—particularly in light of the exculpatory video—they do not, standing alone, constitute anything more than a "conclusory allegation" that they were the result of an agreement. Defendants' motions to dismiss Counts 8 and 9 are granted without prejudice.

**E. Count 10: Discrimination**

Doe brings claims for discrimination under the Rehabilitation Act ("RA") against AEPA and the Hospital Defendants. (ECF No. 1 at 46–48). Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of

her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. In essence, Doe alleges that Defendants failed to provide reasonable accommodations to her, an individual with a disability within the meaning of § 504. (*Id.* ¶ 261).

Defendants challenge Doe's claim on a different basis—specifically, that she was "not denied access to emergency medical services." (ECF No. 32-2 at 6; *see also* ECF No. 37-1 at 8). But it is well settled that § 504 reaches beyond outright denial of access to "impose on covered entities an affirmative obligation to make 'reasonable accommodations' for persons with disabilities so that they can *meaningfully* access their programs." *Montanez v. Price*, 154 F.4th 127, 144 (3d Cir. 2025) (emphasis added) (*citing Alexander v. Choate*, 469 U.S. 287, 301 (1985)). Doe's complaint does not merely challenge "the manner in which [medical care] was provided." (ECF No. 32-2 at 6). Rather, it alleges that, because of her disability, Defendants treated her differently such that she could not "meaningfully access their programs"—that they gratuitously sedated and restrained her rather than evaluating her injuries and allowed her to be knocked out by a security guard on the way to the bathroom. (ECF No. 1 ¶ 261). Defendants' motions to dismiss Count 10 are denied.

**F. Count 11: Corporate Negligence**

Doe also brings claims for corporate negligence under Pennsylvania law against AEPA and the Hospital Defendants. (ECF No. 1 at 49–50). To make out a claim for corporate negligence, Plaintiff must allege that Defendants "fail[ed] to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital." *Thompson v. Nason Hosp.*, 527 Pa. 330, 339 (1991). Plaintiff must also allege "that the hospital knew or should have known about the breach of duty that is harming its patients."

Hospital Defendants argue that "Plaintiff's corporate negligence claim is built around a single encounter involving Plaintiff." (ECF No. 32-2 at 14). Not so. It is true that the basis of Plaintiff's complaint is an incident in which she was involved. But Plaintiff also alleges that the Pennsylvania DOH later found that Abington Hospital was in ongoing non-compliance with federal regulations that constituted "Immediate Jeopardy" to patient rights. (ECF No. 1 ¶ 125–28). At the pleading stage, Plaintiff is not specifically required to "allege that, before Plaintiff's encounter, Abington Hospital knew of prior similar incidents involving these security personnel, knew of a recurring defect in emergency department restraint practices, or ignored a known pattern of comparable events." (ECF No. 32-2 at 14). Plaintiff has alleged in her complaint that Abington Hospital's polices and practices led to her mistreatment there and the ongoing violation of patient rights. At this stage, that is enough to allege that the hospital knew or should have known that it was breaching its duty to its patients.

Separately, AEPA argues that it cannot be held liable for corporate negligence because it is not the type of entity to which such claims apply. (ECF No. 37-1 at 9). At this stage, the Court disagrees. The corporate negligence doctrine first articulated in *Thompson* has been broadened beyond traditional hospitals to encompass other organizations. In *Scampone v. Highland Park Care Center, LLC*, the Pennsylvania Supreme Court held that whether a duty of care attaches depends on a rigorous "individualized inquiry" that applies either the Restatement of Torts § 323 or the factors articulated in *Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000). 618 Pa. 363, 404 (2012). Plaintiff alleges that AEPA provides medical staff to run the emergency room where she was injured; at this stage, the Court declines to rule as a matter of law that AEPA cannot be held liable for corporate negligence on Plaintiff's allegations.

Defendants' motions to dismiss Count 11 are denied.

### G. Count 12: Medical Negligence

Finally, Doe brings medical negligence claims under Pennsylvania law against AEPA, the Hospital Defendants, and the Medical Defendants. (ECF No. 1 at 51–53). Defendants argue that, even in federal court, Pennsylvania law requires Plaintiff to file a certificate of merit along with her claims implicating professional medical judgment. (ECF No. 32-2 at 14; ECF No. 37-1 at 10). No longer: applying a 2026 Supreme Court decision that rejected an analogous Delaware requirement, the Third Circuit recently held that Pennsylvania's rule does not apply to state-law medical malpractice claims brought in federal court. *DiFraia v. Ransom*, 171 F.4th 622, 633 (3d Cir. 2026) (*citing Berk v. Choy*, 146 S. Ct. 546, 557 (2026). Defendants' motions to dismiss Count 12 are accordingly denied.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are **GRANTED** without prejudice as to Counts 4–9 and **DENIED** as to all other counts. An appropriate order follows.

**IT IS SO ORDERED.**

BY THE COURT:

*/s/ John Milton Younge*

**Judge John Milton Younge**